Filed 11/6/24  P. v. Acosta CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SERGIO ACOSTA, JR.,<br><br>    Defendant and Appellant. | F085168<br><br>(Super. Ct. No. SF020234A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Sergio Acosta, Jr., appeals his convictions for attempted murder (Pen. Code,[1] §§ 187, subd. (a), 189; count 1), shooting at an inhabited dwelling (§ 246; count 2), assault with a semi-automatic firearm (§ 245, subd. (b); count 3), carrying a loaded firearm while an active member of a criminal street gang (§ 25850, subd. (c)(3); count 4), two counts of possessing a firearm as a felon (§ 29800, subd. (a)(1); counts 5, 7), two counts of unlawfully possessing ammunition (§ 30305, subd. (a)(1); counts 6, 8), and one count of active participation in a street gang (§ 186.22, subd. (a); count 9). Included in the conviction are various great bodily injury, firearm, and gang enhancements. In his initial briefing, appellant contends all of his convictions must be overturned because of evidence admitted during the guilt phase of his trial. In supplemental briefing, appellant raises issues with his conviction on all gang-related offenses[2] based on an instructional error arising from newly developed case law. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

According to witnesses, on October 17, 2020, Leo Barboza was cleaning his car outside of an apartment building when gunfire erupted. No witness saw the shooter, but some witnesses saw an individual running away from the scene. Barboza was shot twice in his lower extremities. At least one bullet was found inside the apartment to which Barboza fled.

The police investigation at the scene identified two locations where shots were fired. In front of the driveway to the apartments, police found six shell casings from a

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    These gang-related offenses are:  appellant's conviction on count 9 (§ 186.22, subd. (a)); the true findings that the offenses were committed for the benefit of a gang (§ 186.22, subd. (b)(1)) as to counts 1, 2, 3, 5, and 6; the true finding that he was an active member of a gang (§ 25850, subd. (c)(3)) when committing count 4; and the true findings that he personally and intentionally discharged a firearm (§ 12022.53, subds. (d), (e)(1)) as to counts 1 and 2.

nine-millimeter firearm. In a nearby alley, another shell casing from a nine-millimeter firearm and a bullet hole were discovered.

All shell casings were eventually determined to have been fired from the same weapon. That weapon was eventually discovered in the possession of an individual named Jaime Chavez in an unrelated search. Both Chavez and appellant were allegedly part of the same gang, Varrio West Side Shafter (VWS).

In another event initially unrelated to the shooting, the police responded to a disturbance call on December 19, 2020. At that time, police encountered appellant. During this interaction, discussed in further depth below, appellant made an allegedly unprompted admission that he had been the person who shot Barboza. Appellant then detailed his role in the shooting because he was scared of retaliation from VWS for not completing the mission of killing Barboza. While conducting a search related to the initial disturbance call, police located a shotgun and ammunition tied to appellant.

Appellant was arrested and taken to the police station. There, after being provided *Miranda*[3] warnings, appellant repeated his detailed confession related to the shooting. Appellant stated he had been told to "go on a mission to handle [his] brother-in-law," Barboza. Appellant stated he had gone to shoot Barboza with Jaime Chavez and had used Chavez's gun in the shooting. Along with other details, appellant stated that the shooting had been ordered by an individual named John Paul Reyes because Barboza was considered a snitch, appellant had wiped the gun clean and returned it to Chavez after the shooting, appellant had fired six or seven shots and thought he had killed Barboza, and appellant now felt he had been done wrong by VWS and was done with it.

Appellant was subsequently arrested and charged with several offenses related to the shooting and the possession of the shotgun. Following a bifurcated jury trial, of

---

**3**     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

which relevant detail is provided below, he was convicted of the offenses noted above. This appeal timely followed.

## DISCUSSION

In this appeal, appellant's initial briefing focuses on disputes related to the introduction of his pre-and post-*Miranda* statements and to the introduction of substantial evidence related to VWS during the bifurcated portion of his trial on those offenses that did not require proof of gang affiliation. In supplemental briefing, appellant raises an instructional error allegation related exclusively to the bifurcated findings on gang-related offenses. In this opinion, we first consider the admissibility of appellant's pre-*Miranda* statements, then briefly turn to appellant's post-*Miranda* statements, before considering the admission of the gang evidence and its overall impact on the proceedings. We then take up appellant's concerns with the gang-related offenses.

### *Appellant's Pre-Miranda Statements Were Admissible*

Appellant challenges the introduction of statements he made to the police during the December 19, 2020 disturbance call. Prior to his arrest, he spoke with officers and disclosed his role in Barboza's shooting. Appellant contends these statements, made before he received any form of *Miranda* warning, were inadmissible as the product of a custodial interrogation. We first provide additional factual information regarding the incident and the court's ruling before considering whether a custodial interrogation occurred.

#### *Relevant Facts*

In order to determine the admissibility of appellant's proffered statements, the trial court held an evidentiary hearing at which Senior Patrol Officer Jeffery McCuan testified to the discussion he had with appellant leading to the pre-*Miranda* statements. McCuan testified that he was in full uniform when he spoke to appellant on December 19, 2020, at around 4:30 p.m. McCuan had arrived to assist other officers on a call involving a suspect disturbing the peace.

4.

When McCuan arrived on scene, other officers were already present and appellant was sitting on a chair in the driveway a few feet in front of an open garage door at the front of the property. Appellant was accompanied by another officer at the time but was not handcuffed. McCuan approached appellant and began speaking with him. At that time, the other officer went inside the apartment, leaving McCuan as the only officer near appellant. McCuan agreed he was taking over the role of watching appellant and would have stopped appellant if he attempted to leave. During this time, other officers searched the property.

McCuan did not handcuff appellant, did not tell him he was under arrest, did not draw a gun, and described the conversation with appellant as cordial and conversational. McCuan testified that he opened the conversation by greeting appellant and "talking about the day." McCuan soon asked about the politics of VWS. At the time, McCuan was a gang officer who was familiar with VWS and had previously contacted appellant as part of those duties.

While McCuan initiated the conversation about VWS's operations, management, and current disputes, he affirmed the overall conversation centered around appellant telling a story in response to the inquiry. During that conversation, appellant told McCuan he was scared because he had not completed a mission to kill Barboza. Appellant further disclosed information about the date of the incident and who he was with during the shooting. McCuan stated these disclosures were not in response to specific questions but part of appellant "just telling me like a story." However, McCuan admitted to asking questions such as "what was the mission" and continuing to ask general questions out of curiosity.

At some point, the officers searching the residence found a firearm, and McCuan arrested appellant for possessing the firearm. Appellant was then transported to the police station where he was interviewed again, this time with proper *Miranda* warnings, and where he again admitted to his role in shooting Barboza.

5.

After hearing brief arguments on the motion in limine to exclude appellant's pre-*Miranda* statements, at which time the court summarized its view of the evidence as lacking "any evidence of questions that would suggest to [appellant] that he was being asked if he's committed any crimes lately" and as sounding "like [appellant] volunteered information that he was scared and the reason why," the trial court concluded appellant's statements were not "the product of a custodial interrogation" under *Miranda*. The court therefore denied the motion to exclude the statements.

*Standard of Review and Applicable Law*

Generally, when reviewing a *Miranda* dispute, " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.)

*Miranda* holds that law enforcement must advise a suspect of certain rights, such as the right to remain silent and the right to have counsel present, before conducting a custodial interrogation. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

Whether a person is in custody hinges on whether a reasonable person would feel free to leave. (*Howes v. Fields* (2012) 565 U.S. 499, 508–509; see *Miranda, supra*, 384 U.S. at p. 444.) An interrogation is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from a suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299–301.)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal

6.

arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.)  The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

All the circumstances of the interrogation are relevant to determining whether it was custodial.  (*People v. Moore, supra*, 51 Cal.4th at p. 395.)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)  The most relevant circumstances typically include:  "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid.*)

*The Questioning Was Not a Custodial Interrogation*

Under the record presented, we conclude there was no custodial interrogation. The record shows that appellant was involved in an interaction with the police tied to a

disturbing the peace allegation. Although the police instigated the conversation with appellant and eventually arrested appellant, there were few factors suggesting custodial interrogation in the interaction. The setting was a public space and involved only one officer. Appellant was not handcuffed and not interrogated specifically on any crimes. Appellant had not been placed under arrest and, as the trial court found, voluntarily provided a narrative in response to general questions about his known gang affiliation.

Further, there are no objective indications that McCuan questioned appellant to obtain information about a specific crime or to obtain incriminating statements. There are no indications that the questioning covered an extended period of time nor that it was aggressive, confrontational, or accusatory. And there are no objective indications that the reason for police contact—a response to a disturbing the peace call—was used as a pretext to investigate the prior shooting. Rather, the record presented strongly supports the conclusion that appellant voluntarily provided information to the police based on a mere invitation to speak about something other than the current event. Overall, the objective factors are far less suggestive of a custodial interrogation than other fact patterns deemed noncustodial. (See *People v. Davidson* (2013) 221 Cal.App.4th 966, 972–973 [question regarding ownership of motorcycle asked to handcuffed suspect on public street did not rise to level of custodial interrogation].)

On appeal, appellant points to several facts specific to McCuan to argue that McCuan had a hidden agenda when questioning appellant. These include that McCuan was a seasoned member of the gang task force who knew appellant was a gang member and related to Barboza. Appellant argues McCuan was eager to obtain information about the two-month-old unsolved shooting and therefore baited appellant into a full confession. According to appellant, at the moment he confessed to some knowledge of the shooting, all further interactions should be considered a custodial interrogation.

We do not agree. Even accepting the facts and inferences regarding intent identified by appellant, an officer's knowledge or subjective beliefs are relevant to the

8.

custodial interrogation inquiry only when " 'they are conveyed, by word or deed, to the individual being questioned.' " (*People v. Stansbury* (1995) 9 Cal.4th 824, 830.) Nothing in the record indicates McCuan conveyed a belief appellant was involved in the Barboza shooting prior to appellant's willful disclosure of that fact, and nothing indicates McCuan modified his behavior or questioned appellant in a manner that would have caused appellant to feel he could not have ceased the conversation at any point thereafter.

Nor do we agree with appellant's contention that his admission to participating in a shooting constituted an inflection point after which any questioning qualified as a custodial interrogation. Appellant's argument focuses upon the amount of detail provided in the initial confession and the fact that appellant was later questioned on the topic after being provided *Miranda* warnings. But none of these provide objective indicia that appellant's voluntary decision to disclose his fear of retaliation for failing at a prior murder attempt resulted in a custodial interrogation prior to appellant receiving *Miranda* warnings. The facts still remain that the trial court concluded the initial conversation involved appellant telling a story and McCuan only asking general questions. Appellant fails to connect his admission to a criminal act to any objective indicia that appellant could not have ceased providing information to McCuan or was otherwise caused to believe appellant could not have terminated the story he was telling. Even if appellant knew he was suspected of a crime, that fact alone is insufficient to demonstrate a custodial interrogation occurred. (See *Stansbury v. California, supra*, 511 U.S. at p. 325 ["Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."].) The record does not support a conclusion that the general questioning McCuan engaged in regarding general gang policies and the broad details of appellant's fear of retaliation morphed from noncustodial to custodial merely because appellant disclosed that he committed a criminal act.

9.

### *Appellant's Post-Miranda Statements Were Admissible*

Appellant next challenges the introduction of statements made after he was placed under arrest, transported to the police station, given *Miranda* warnings, and requestioned. Appellant contends the record demonstrates these statements were obtained through a deliberate two-step interview process designed to avoid *Miranda* and thus violate the principles described in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). The People contend this argument was forfeited because it was not raised to the trial court[4] and that it fails regardless.

*Relevant Facts*

Following the ruling on the pre-*Miranda* statements, the court conducted "the next part of this 402 hearing which involves statements allegedly made which were recorded." The recording and transcript were reviewed by the court. After review, the court asked, "Is there any argument that *Miranda* was not complied with?" (Italics added.) Appellant's counsel submitted the issue, and the court ruled: "[T]here is no violation of *Miranda* and … the evidence supports a finding that he was properly advised of his *Miranda* Rights and that … he understood them, and then by speaking he made a voluntary decision to speak, which was an implied waiver of his rights." (Italics added.)

The transcript begins with McCuan saying, "All right, … will you come over here, brother? I gotta get an updated follow-up from you, my friend. All right, … can you have a seat for me, man? So here's the deal, brother. You told me some stuff on scene. Do you wanna talk with me? Just me? Or me and him?"

Appellant responded, "Doesn't matter." The transcript then reads:

---

[4]  As appellant also raises an ineffective assistance of counsel claim, we opt to consider the merits of the claim despite any potential forfeiture. (See *People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing the merits of a claim, despite its possible forfeiture, because defendant asserted ineffective assistance of counsel].)

"[McCuan]: All right, there's no one else out here. Do you wanna go to the interview room or do you wanna talk here?

"[Appellant]: Right here.

"[McCuan]: Okay. So before I, before I talk to you or ask you anything, I gotta read you your fuckin' *Miranda* rights, okay?" (Italics added.)

After a bit more back and forth, McCuan read, and appellant acknowledged, his *Miranda* rights. Appellant then provided a detailed explanation of what led to and the events involving his attempt to shoot Barboza, as well as why he was in possession of a shotgun.

*Standard of Review and Applicable Law*

"[A]n initial *Miranda* violation does not necessarily require the exclusion of statements following proper advisements." (*People v. Young* (2019) 7 Cal.5th 905, 924.). However, in *Seibert*, "[a] plurality of four justices explained that 'when interrogators question first and warn later' ([*Seibert, supra*, 542 U.S.] at p. 611 (plur. opn.)), the later, warned confession is admissible only if 'in the circumstances the *Miranda* warnings given could reasonably be found effective.' (*Id.* at p. 612, fn. 4 (plur. opn.).) Under the facts of the case, the four justices concluded that the circumstances 'do not reasonably support a conclusion that the warnings given could have served their purpose,' and the postwarning statements therefore were inadmissible. (*Id.* at pp. 616–617 (plur. opn.).)" (*People v. Krebs* (2019) 8 Cal.5th 265, 308–309.) In a concurring opinion, Justice Kennedy stated that he " 'would apply a narrower test applicable only in the infrequent case, such as [in *Seibert*], in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.' " (*Id.* at p. 309, quoting *Seibert*, at p. 622 (conc. opn. of Kennedy, J.).)

The specific facts underlying *Seibert* comprised "a situation where the interrogating officer 'made a "conscious decision" to withhold *Miranda* warnings.' [Citation.] The police officer testified that he did so in accordance with 'an interrogation

11.

technique he had been taught:  question first, then give the warnings, and then repeat the question "until I get the answer that [the suspect] already provided once." ' [Citation.] Another police officer testified that his department 'promoted' 'the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession.' " (*People v. Krebs, supra*, 8 Cal.5th at p. 308, second bracketed insertion in original.)

*With No Prior* Miranda *Violation,* Seibert *Is Inapplicable*

The basic question in *Seibert*, as it was in the precedent preceding it, *Oregon v. Elstad* (1985) 470 U.S. 298, was how to handle the situation where initial questioning violated *Miranda* but a defendant made later inculpatory statements after a proper *Miranda* warning.  (See *Seibert, supra*, 542 U.S. at p. 604 ["This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession."].)  This court's conclusion that no *Miranda* violation occurred prior to when the warnings were given differentiates this case from those like *Elstad* and *Seibert*.  Where no initial warning was required, there can be no claim that a two-step process was utilized to avoid *Miranda*'s requirements.  Appellant's *Seibert* claim thus fails.

### Admission of Gang Evidence During the Nongang-related Offenses Trial

As noted, the trial court bifurcated appellant's criminal proceedings, trying all of the gang-related offenses separately from those offenses that did not require proof of gang affiliation.  Throughout the proceedings, however, the People noted their intent to introduce gang evidence given their contention that the motive and intent underlying appellant's conduct was, as he admitted, gang related.  Appellant now challenges the trial court's decision to allow the introduction of a substantial amount of gang evidence into the trial proceedings related to offenses not requiring proof of gang affiliation.  Appellant contends the decision to admit the evidence was an abuse of discretion that denied him of his due process rights.

*Relevant Facts*

Prior to trial, appellant sought to exclude gang evidence from the bifurcated portion of the trial focusing on nongang offenses. Appellant conceded that some gang evidence was admissible but argued evidence related to predicate offenses or alleged gang members not involved in the underlying offenses should be excluded. The trial court ruled that general gang evidence would be admitted for the limited purpose of proving motive, purpose, and intent. It heard separate arguments on the predicate offense evidence and concluded that a limited set of offenses would be admitted. The argument made was that this evidence was relevant to prove a gang actually exists.

In a subsequent argument, appellant sought to exclude admission of the court dockets, contact information, and certain photographs underlying the predicate offenses. The People sought to justify this evidence by affirming it was limited to individuals discussed in appellant's statements to police. The court accepted this offer of proof and concluded the evidence was not more prejudicial than probative. And, just prior to the testimony of the gang expert, appellant renewed his objections and raised a separate objection to the PowerPoint presentation the gang expert intended to show the jury. The court reviewed the document and, although it acknowledged some prejudice, concluded that the prejudice did not substantially outweigh the probative value. The court further noted its use of a limiting instruction to inform the jury of the limited use of the gang evidence.

Based on these rulings, the prosecution introduced a substantial amount of evidence related to its assertion that appellant's gang affiliation was relevant to appellant's motive and intent for conducting the shooting and illegally possessing

13.

firearms and ammunition. To focus the extent of the evidence introduced and discussed, we note that appellant challenges 10 evidentiary admissions,[5] which we detail below.[6]

First, the disputed PowerPoint presentation was published to the jury during the course of testimony from Shafter Police Department Sergeant Marvin Gomez. This slide deck contained background on Gomez's past cases, including the names, case numbers, and gang affiliations of several unrelated individuals that were both part of VWS and part of unrelated gangs. Gomez mentioned other gangs once during his testimony, when directly describing his prior work as a testifying gang expert.

Second, Bakersfield Police Officer Jeff Martin testified about and supported the introduction of evidence related to two crimes committed in 2009 and 2010. In both of these offenses, an individual named John Paul Reyes was stopped by police and arrested for possessing one or more shotguns. In the first instance, individuals found in the car were wearing insignia that Gomez later tied to VWS and used to support his conclusion that Reyes was a VWS member.

Third, Shafter Senior Police Officer William Draucker testified about a police response in 2019. During that response, Draucker stated he came in contact with five individuals: Andrew Gonzalez; Antonio Gonzalez; Edwin Hernandez; Manuel Orozco; and Marco Silva. Gomez later concluded this meeting was significant based on other evidence showing Andrew Gonzalez, Edwin Hernandez, and Marco Silva were all gang members; evidence which included photos from Hernandez's Facebook page, introduced through Gomez.

Fourth, Shafter Police Sergeant Alecio Mora testified and supported the introduction of evidence related to a 2014 robbery involving Andrew Gonzalez and a

---

[5]    Appellant identifies 11 challenges in his opening brief, but one challenge is presented twice.

[6]    Appellant does not challenge other gang evidence, including testimony tending to show Barboza was a fellow gang member with the moniker "Lil Bumper."

2017 traffic stop resulting in the arrest of two individuals, Jesus Alanis and Edward Denojean, after a firearm was located in the vehicle.

Fifth, and relatedly, Bakersfield Police Officer Dominic Ramirez testified and supported the introduction of evidence related to a 2020 robbery resulting in Jesus Alanis's arrest. Gomez later testified that Jesus Alanis and Edward Denojean were both gang members based in part on this evidence.

Sixth, Bakersfield Police Officer Andres Rangel testified and supported the introduction of evidence related to a 2020 armed robbery of a smoke shop involving three individuals working in concert. McCuan then testified these individuals were Jesus Alanis, Edwin Hernandez, and Jaime Chavez. Gomez noted these crimes involved gang convictions and used those facts to support his opinion that each individual was a gang member.

Seventh, Bakersfield Police Detective Christian Hernandez testified and supported the introduction of evidence related to the investigation of a potential shooting that occurred in 2020. The incident involved several people, including Edwin Hernandez and Daniel Perez, involved the discovery of gang graffiti in multiple rooms of an inn, and resulted in the recovery of several firearms from different locations. Gomez then referenced this incident in his discussion of activities by VWS members.

Eighth, Shafter Police Sergeant Phil Yoshikawa testified and supported the introduction of evidence related to a shooting that occurred in 2012, involving Jaime Chavez. Gomez relied on this evidence in concluding Chavez was a VWS member and in generally tying the various alleged gang members together.

Ninth, Shafter Police Detective Janet Fernandez testified about a 2018 traffic stop involving appellant where appellant was alleged to have thrown a firearm out of the vehicle. There was no indication who else may have been in the car with appellant. Gomez relied on this incident and related evidence to support his opinion that appellant was a member of VWS.

Tenth, in the course of Gomez's expert testimony, he detailed a connection between VWS and the Mexican mafia. Several times during his testimony, while explaining the significance of the number "13" and the use of three dots, representing the phrase "Mi Vida Loca," Gomez stated the gang symbols were a way of showing allegiance to the Mexican mafia.

Ultimately, relying on both the contested and uncontested gang evidence submitted, Gomez rendered an opinion that appellant was an active member of VWS, a criminal street gang, at the time of the shooting.

*Standard of Review and Applicable Law*

Under Evidence Code section 352, the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"[A]lthough the admission of gang evidence may sometimes result in fundamental unfairness (see, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 232), this is not always the case.… [G]ang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime." (*People v. Tran* (2022) 13 Cal.5th 1169, 1208.) " 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] … [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] … Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' [Citation.] 'A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion.' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964, fifth bracketed insertion added.)

16.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson*[7] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Improperly admitted evidence may make a trial fundamentally unfair " ' "[o]nly if there are no permissible inferences the jury may draw from the evidence …. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." ' " (*People v. Coneal, supra*, 41 Cal.App.5th at p. 972, first bracketed insertion added.)

*Any Alleged Error Was Harmless*

The People appear to have presented their case under a belief that to prove the existence of a gang for purposes of highlighting appellant's motive and intent, they must prove the existence of a criminal street gang under the statutory definition included with the gang enhancements—including all constitutional and legal requirements for such proof. We question the appropriateness of such a belief. However, we do not consider the proper scope of evidence admissible to prove motive and intent in this case as, even assuming the contested evidence was erroneously admitted, appellant cannot demonstrate prejudice.

Even assuming the trial court erred under Evidence Code section 352, the evidence carried at least minimal evidentiary value in most instances. The existence and activities of VWS were at least minimally relevant to how and why appellant would carry out a shooting on its behalf. To the extent that evidence of prior crimes by gang members can be considered to have no evidentiary value, the court properly protected against

---

7       *People v. Watson* (1956) 46 Cal.2d 818.

improper use of that evidence by providing a limiting instruction to the jury directly on that point.  Accordingly, upon review of the record, this court does not consider the contested evidence to rise to the level of that which would necessarily prevent a fair trial and constitute a constitutional due process violation.

In addition, this court does not find the record supports a conclusion under the *Watson* standard that it is reasonably probable the verdict would have been more favorable to appellant absent the error.  The principal evidence admitted proving appellant's guilt was his own full, detailed, and voluntarily offered confession.  The additional evidence submitted only served to identify the individuals involved as gang members and confirm, overall, that the motive behind the shooting was tied to appellant's gang connections.  Further, appellant defended by arguing that the prosecution lacked evidence sufficient to prove guilt beyond a reasonable doubt even with the confession, challenging whether appellant's statements matched the facts of the shooting.  As the confession satisfied the prosecution's burden to prove guilt beyond a reasonable doubt if believed, the allegedly improper admission of the additional gang evidence related to motive and intent does not create a reasonable probability of a more favorable outcome.[8]

### *Jury Instructions Regarding Gang-related Offenses*

In supplemental briefing, appellant argues the trial court erred during the bifurcated portion of his trial dealing with the gang-related offenses because it gave a now inadequate instruction related to the elements of a criminal street gang.  The People agree that the instruction used was inadequate given the analysis of section 186.22, subdivision (f) contained in *People v. Clark* (2024) 15 Cal.5th 743, 749, 761–763 (*Clark*) but argue any error was harmless beyond a reasonable doubt in this case.  We agree with the People that the error was harmless in this instance.

---

[8]    Appellant also raises a cumulative error argument.  As we have found no error in the admission of appellant's statements and any error in admitting the gang evidence was harmless, there is no cumulative error remaining to consider.

18.

*Relevant Facts*

Appellant's trial occurred in June 2022, after certain amendments to section 186.22 became effective and resulted in modifications to the elements of the various gang-related offenses in this case.  Further, as noted, the gang-related offenses were bifurcated from the nongang-related offenses in this matter.  Thus, in the second phase, the People called several witnesses, including recalling their gang expert, Sergeant Marvin Gomez, to add additional evidence to the record.

The first witness called, Officer Andres Rangel, provided additional detail about an October 12, 2020 robbery that had been discussed in the guilt phase.  Rangel detailed surveillance video of the robbery and explained that three suspects committed the robbery.  At first, two suspects entered the store, one of whom indicated he wanted to buy a hat.  As the cashier opened the register to complete the transaction, the suspect pulled out a firearm.  At this point, the third suspect entered the store with a bag, all three worked to fill that bag with money, and then all three fled.  Booking and docket evidence was admitted based on this testimony.

The next witness, Officer William Draucker, testified to an incident that occurred on January 16, 2016.  In that incident, Draucker pulled over two individuals for a traffic stop and discovered a "glass pipe for smoking methamphetamine, over 14 grams of methamphetamine, and over 31 grams of marijuana" hidden in the vehicle.  A later search warrant uncovered messages between the two individuals about "selling narcotics to other members of [VWS]."

Finally, the prosecution recalled Gomez to provide additional expert testimony and opinion regarding the gang-related offenses.  Relevant to the issues on appeal, Gomez discussed the general nature of VWS and identified its primary activities, including crimes such as drug sales, illegal possession of firearms, robbery, criminal threats, and murder, among others.  Gomez explained that orders of high ranking VWS members had to be followed and that VWS generally looked down on and sought to harm dropouts

19.

before explaining that gangs generally require their members to "put[] in work" or commit crimes for the gang in order to benefit the gang.

Gomez then discussed prior gang activities identified as predicate offenses. The first predicate offense discussed involved the 2016 traffic stop detailed by Draucker. Gomez indicated that the stop occurred in VWS territory and that the amount of drugs found was significant. Gomez confirmed that both individuals in the car were gang members and that they had been convicted of selling narcotics and active participation in a criminal street gang. Gomez next explained the crime benefited VWS in a monetary way, noting money from drug sales is "a source of income for the gang members, who distribute amongst each other. That extra income can be used to buy additional drugs so you can sell more drugs. Extra income can also be used to purchase firearms if need be. Selling drugs assists the gang with their gang lifestyle." Gomez affirmed that was also shown through the text messages observed.

Gomez then moved to the second identified predicate offense, the 2017 traffic stop previously discussed by Mora. Gomez found the incident significant because it involved two active gang members and occurred in VWS's territory. Gomez explained the crime benefited the gang because "when a gang member has a firearm it's not just his firearm. It's readily able to be passed around to other gang members so they can use it to commit crimes such as drug dealing, robbery, things like that. But also the possession of a firearm provides immediate protection for either that gang member or his fellow gang members, whether they are in their territory or in rival territories. So possessing the firearm is a way to protect your territory and your illegal activities."

Gomez then proceeded to the third indicated predicate offense, the 2020 investigation of a potential shooting at an inn previously discussed by Detective Christian Hernandez. Gomez affirmed that the investigation involved multiple individuals occupying multiple rooms at the inn and resulted in the discovery of firearms, methamphetamine, and multiple instances of gang graffiti. Gomez explained the inn was

20.

located in an area claimed by VWS and was being used for certain primary gang activities, such as drug sales and illegal firearm possession. Gomez also noted that all of those discussed as part of the incident pleaded guilty to either illegal weapon possession or illegal drug sales charges and related gang enhancements and were active members of VWS at the time.

Gomez then identified how the crime benefited VWS in a manner that was more than reputational, testifying that the "possession of the firearm by the gang benefits the gang by protecting the gang's claimed territory. In particular, they are claiming it by using graffiti, VWS. You know, this is our area. They are using the firearm to protect their territory. Also to protect their criminal activity, in this particular case sales of narcotics. As stated, firearms protect the drug sales operation against rival drug dealers or just anybody trying to steal from them." Gomez also noted that the use of graffiti to identify the territory causes fear and intimidation in citizens, which makes people less likely to report crimes.

Finally, Gomez discussed the fourth predicate offense, the 2020 robbery of a smoke shop previously discussed by Officers Andres Rangel and Jeffery McCuan. Again, Gomez confirmed that the robbery occurred in VWS territory and noted that the individuals involved were all active members of VWS who were eventually convicted of both the robbery and related gang enhancements. With respect to the benefit committing this crime gave to VWS, Gomez explained money "serves as a source of income.… [W]hen you have the money not only does it benefit the gang lifestyle but it also allows the gang members to purchase narcotics to resell so they can make more money. It also allows the gang members to purchase firearms, if they have to."

Gomez continued, testifying the "crime was also in association with each other. You had three gang members actively working with each other. One had a firearm, was the point of contact. Another one was assisting him in the middle of the store. A third one came in and had a plastic bag. Subsequently, the second and third suspect and the

21.

first suspect, they all put money in the bag. They actively worked together to commit this robbery. So it not only was for the benefit, it's also in association with each other."

Gomez's testimony then focused on appellant's status as a gang member and other issues unrelated to the claim on appeal. After Gomez's testimony, both sides rested and the jury was provided additional instructions. Relevant to the issues in this appeal, the jury was instructed as to the definition of a criminal street gang as follows:

"A criminal street gang is an ongoing organized association or group of three or more persons, whether formal or informal, one, that has a common name or common identifying sign or symbol; two, that has as one or more of its primary activities the commission of or attempted commission of murder, robbery, assault with a deadly weapon, assault with a firearm, assault with semiautomatic firearms, shooting at an inhabited house, sales of narcotics, unlawful possession of firearms, unlawful possession of ammo, and criminal threats; and, three, whose members collectively engage in or have engaged in a pattern of criminal gang activity."

The jury was also instructed that a "pattern of criminal gang activity" means "one, the commission of, attempted commission of, or conviction of any combination of two or more of the following crimes: robbery, sales of narcotics, transportation of narcotics, unlawful possession of firearms, or unlawful possession of ammunition; two, at least one of those crimes was committed after September 26, 1988; three, the most recent crime occurred within three years of one of the earlier crimes and within three years of the date of the charged offense; four, the crimes were committed on separate occasions or were personally committed by two or more members; five, the crimes commonly benefited a criminal street gang; and, six, the common benefit from the crimes was more than reputational."

The case was eventually submitted to the jury, who found true the gang-related enhancements and convicted appellant of count 9.

*Standard of Review and Applicable Law*

Relevant to this case, the 2022 amendments to section 186.22 narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, organized association or group of three or more persons … whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), as amended by Stats. 2021, ch. 699, § 4.) It also narrowed the definition of a "pattern of criminal gang activity," which is demonstrated by proving the existence of "two or more" predicate offenses, by reducing the crimes relevant to proving such a pattern and requiring "at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational …." (§ 186.22, subd. (e)(1).)

The concept of collectively engaging in a pattern of criminal gang activity led to a conflict concerning whether relevant crimes could be committed by a single individual. (*Clark, supra*, 15 Cal.5th at p. 749.) The Supreme Court took up *Clark* to resolve this conflict, but also went on "to consider what the collective engagement requirement does mean." (*Ibid.*) In this broader review, the court found that the changes require "a showing that links the two predicate offenses to the gang as an organized, collective enterprise." (*Id.* at p. 761.) Proving a crime confers a benefit on the gang is not enough, as "it is still necessary to show that the offense reflected an 'organized effort' by the criminal street gang"—essentially, "how the gang works together *as a gang*"—shown by "a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Id.* at p. 762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure,

23.

meaning its manner of governance; its primary activities; or its common goals and principles." (*Ibid.*)

The Supreme Court cautioned, however, that it did not intend to "overstate the degree of formality required." (*Clark, supra*, 15 Cal.5th at p. 762.) As gangs can be organized in a multitude of ways, the court noted, "[C]ollective engagement will be established in different ways." (*Ibid.*) Examples of relevant evidence provided by the court include: a direct order from the gang to commit specific crimes; a more general, well-understood expectation that members must engage in certain types of offenses; and a demonstration that the offenses reflect the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question. (*Ibid.*)

The Supreme Court also noted other illustrations of collective engagement, including: a gang tasking members with collecting "taxes" from local businesses or drug dealers as a way of maintaining the gang's territory; a gang directing members to sell drugs in the gang's territory with the proceeds from the sales used to benefit the gang; gang members being authorized to attack rivals on a " 'green light list' " maintained by the gang; and a situation where one member of a gang sells drugs for the gang while a second murders a rival drug dealer and a third hides the murder weapon. (*Clark, supra*, 15 Cal.5th at p. 763.) In all of these examples, "gang members play a role in enforcing the territory and terms of the gang's drug trade or, by killing certain targeted individuals, carry out an edict to eliminate rivals who pose a threat to the gang." (*Ibid.*) In other words, in addition to benefiting the gang, the examples "relate to the essential characteristics of the criminal street gang—its organizational structure, primary activities, or common goals and principles." (*Ibid.*)

Notably, while the examples include evidence that may also be relevant to the common benefit element of section 186.22, the Supreme Court stressed that the collective engagement element is "conceptually distinct from the requirement to prove that each predicate offense 'commonly benefited' the gang (§ 186.22[, subd. ](e)(1)), even though

the facts necessary to prove the two requirements will often overlap with one another." (*Clark, supra*, 15 Cal.5th at p. 763.) The core inquiry for the collective engagement element, as previously noted, is "whether there exists an organizational nexus between the crime and the gang." (*Ibid.*)

A trial court has a sua sponte obligation to provide correct instructions on the law. (See *People v. Mil* (2012) 53 Cal.4th 400, 409 [identifying obligation in context of offenses and special circumstances].) When the jury instructions provided in a case fail to account for new elements that apply retroactively, a defendant "is entitled to a remand for further proceedings" unless the error "is harmless beyond a reasonable doubt." (*Clark, supra*, 15 Cal.5th at p. 763.)

### *The Instructional Error Was Harmless Beyond a Reasonable Doubt*

The parties in this case agree that the instructions provided did not account for the collective engagement requirement discussed in *Clark* and thus were erroneous. The People argue, however, that the error was harmless because they provided enough detail regarding the offenses to demonstrate collective engagement as currently defined. Upon review, we agree that at least two of the predicate offenses discussed include sufficient evidence tying the offenses to the organizational structure, primary activities, or common goals and principles to demonstrate beyond a reasonable doubt that the instructional error was harmless.

We begin our analysis by noting the failure of proof identified in *Clark*. In *Clark*, the evidence submitted to prove the predicate offenses, in the form of certified convictions, provided "little information besides the fact that" one person pleaded guilty to robbery and the defendant had previously pleaded guilty to attempted residential burglary. (*Clark, supra*, 15 Cal.5th at pp. 750, 764.) Although the gang expert provided information on "the benefits that might flow to the gang from the charged crimes," there was no evidence establishing whether the offenses were actually committed to benefit the gang or whether "there existed an organizational nexus between those offenses and the

25.

gang as a collective enterprise." (*Id.* at p. 764.) Indeed, the "testimony did not address whether the predicate offenses, as distinct from the charged burglary, benefited the gang, or how they were otherwise related to the gang." (*Id.* at p. 750.)

The evidence presented in this case was quite different. Specific information about each of the predicate offenses was presented to the jury. This included the circumstances of the offenses, the individuals involved and their specific ties to the relevant gang, and the general way that each predicate offense benefited VWS. All four of the predicate offenses in this case involved coordinated activity between multiple gang members, as opposed to the mere fact that a single gang member was convicted of a prior offense. In addition to the evidence of factual context and gang interactions, Gomez identified a specific, non-reputational benefit to VWS from each of the predicate offenses. In doing so, he detailed how, in his experience, gangs like VWS operate and why the predicate offenses benefited VWS. These benefits include improving VWS's finances, improving VWS's protection of its members and territories, and satisfy general gang principles of putting in work for VWS.

Thus, for the first offense, arising out of the January 16, 2016 traffic stop, the evidence shows that two known and active VWS members were caught transporting more than 14 grams of methamphetamine and over 31 grams of marijuana. In addition, cell phone evidence shows that these two active VWS members had plans to sell drugs to other VWS members. Gomez then explained that selling drugs provides a source of income for VWS and allows money to be moved between members of VWS. This allows for other illegal activities, including the purchase of firearms, and generally benefits VWS's lifestyle. In this way, the evidence shows the commission of a crime, that this crime is a primary activity of VWS, and that VWS's organizational structure benefits from this type of primary activity because it allows for wealth distribution within VWS and the facilitation of other crimes by VWS. Further, evidence shows that VWS members possessing the drugs were involved in selling drugs to other VWS members,

26.

tying the specific crime to the general organizational structure, primary activities, and common goals of VWS.

Similarly, for the third offense, arising out of the 2020 search of an inn, the evidence shows that several active gang members had spread out among several rooms. In the search, the police found weapons and graffiti in multiple rooms. The individuals arrested pleaded guilty to one or both of illegal possession of a firearm and illegal sale of narcotics, along with gang enhancements. Gomez then explained that these offenses are primary activities of VWS and that the inn was within VWS's territory. VWS benefits from these primary activities in their territory because possessing the guns bolsters protection of their territory and of their drug sale operations. In this way, the evidence shows the commission of several crimes in a concerted activity of multiple gang members, that those crimes are primary activities of VWS, and that VWS's authority over its territory and its finances benefitted from the commission of these crimes because other rivals would be excluded. The series of crimes committed at the inn were thus appropriately tied to an organizational purpose and set of primary goals for VWS as a whole.

Further, for the fourth offense, the evidence shows three known and active gang members taking different roles in the coordinated robbery of a smoke shop. While the first two entered the store and created a pretense for the cashier to open the cash register, the third waited outside. Once the case register was opened, one gang member pulled a weapon and the third member, previously waiting outside, entered with a bag. All three gang members then worked together to fill the bag with money and flee. Gomez explained that robbery and the illegal possession of firearms are primary activities of VWS and again reiterated how obtaining money benefits VWS's lifestyle as well as the ability to conduct other illegal activities. Gomez also explained, however, that in this instance, the conduct was also significant because multiple gang members worked together to commit crimes that would benefit VWS. He specifically noted the crime "not

27.

only was for the benefit [of VWS], it's also in association with each other." In this way, the evidence and testimony show a common plan among multiple gang members to work together to obtain funds through a coordinated robbery in a manner that fits with VWS's primary activities and benefitted VWS.

We note, for completeness, that the evidence related to the second predicate offense, showing illegal possession of a firearm in an incident involving two gang members, does not have the same factual support as the other three with respect to the collective engagement element. Although there were two active gang members involved and the evidence confirmed that possessing a firearm benefited VWS, there was no specific evidence showing coordinated action between VWS members (such as the messages in the first offense or the coordination in the fourth) or anything other than the bare fact of the crime (such as the ties to protecting claimed territory and engaging in drug sales within that territory in the third offense) to imply that the crime was tied to a collective enterprise as opposed to the mere criminal intent of the individuals involved.

The gang-related offenses in this case, however, only require proof of two predicate offenses. Accordingly, even if the second predicate offense fails, the evidence still shows beyond a reasonable doubt that the collective engagement required by *Clark* was proven for three of the predicate offenses. Thus, unlike *Clark*, the evidence here shows the predicate offenses not only benefited VWS generally but also that the offenses were part of a collective engagement by members of VWS and benefited VWS as a whole. We thus conclude that any error in failing to specifically instruct in line with *Clark* was harmless beyond a reasonable doubt in this case.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

POOCHIGIAN, J.